AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>JEFFREY CRAIG YOHAI | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO. MJ 18 - 2749 |

Complaint for violation of Title 18, United States Code, Sections 1349, 1343, 1028A, 3147

| NAME OF MAGISTRATE JUDGE<br>Honorable Paul Abrams | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>2017 through the present | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

**See Attachment**

FILED
CLERK U.S. DISTRICT COURT
OCT 17 2018
CENTRAL DISTRICT OF CALIF.
BY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Sherine D. Ebadi |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1] | DATE<br>October 17, 2018 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Andrew Brown, 11th floor, x0102    REC: Detention    **WARRANT**

**Complaint Attachment**

Count One (18 U.S.C. §§ 1349, 1343, and 3147)

Beginning in or before 2017, and continuing through at least October 17, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant JEFFREY CRAIG YOHAI ("YOHAI"), together with others known and unknown, conspired to commit wire fraud, in violation of Title 18, United States Code, Section 1343.  The object of the conspiracy was carried out, and to be carried out, in substance, as follows:  Defendant YOHAI and his co-conspirators would attempt to trick lenders into providing loans based on false and inflated property appraisals.  Defendant YOHAI would also gain access to a luxury home by promising to secure wealthy short-term renters for the property, but defendant YOHAI would collect the rent and not forward it to the home owner.  Defendant YOHAI and his co-conspirators would lull the home owner into continuing their arrangement by providing the home owner with worthless checks and falsified records of wire transfers, purported as payment for past due rent.  Defendant YOHAI and his co-conspirators intended to execute, and did execute, this fraudulent scheme through the use of interstate wires.

Defendant JEFFREY CRAIG YOHAI committed this offense while on release pending sentencing.

Count Two (18 U.S.C. §§ 1028A and 3147)

Beginning in or before 2017, and continuing through at least October 17, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant JEFFREY CRAIG YOHAI knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Sections 1349 and 1343, Conspiracy to Commit Wire Fraud, as charged in Count One.

Defendant JEFFREY CRAIG YOHAI committed this offense while on release pending sentencing.

**AFFIDAVIT**

I, Sherine D. Ebadi, being duly sworn, declare and state as follows:

I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed for nine years.  I am currently assigned to the White Collar Crimes squad, where I specialize in the investigation of complex financial crimes, including bank fraud, wire fraud, identity theft, investment fraud, securities fraud, and money laundering.  In addition to conducting numerous fraud investigations during my career, I have received both formal and informal training from the FBI and other entities regarding violations of various fraud statutes.

**Seeking Arrest and Search Warrant for Jeffrey Yohai for New Crimes Committed While on Release Pending Sentencing**

I make this affidavit in support of an arrest warrant for JEFFREY CRAIG YOHAI ("YOHAI"), and a search warrant for YOHAI's person, for violations of Title 18 U.S.C. §§ 1349 and 1343 (Conspiracy to Commit Wire Fraud), 1028(A) (Aggravated Identity Theft) and 3147 (Offense Committed While on Release).

The facts set forth in this affidavit are based upon my personal observations, statements made to me, or in my presence by witnesses, documents I obtained and reviewed through the course of my investigation, my training and experience and information obtained from other Federal Agents and State Law Enforcement Officers.  This affidavit is intended to show merely that there is probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

1

**Summary of Prior Investigation of Crimes to Which
Jeffrey Yohai Already Pled Guilty**

YOHAI's Previous Offenses

Below I summarize the earlier investigation into the crimes
Jeffrey YOHAI was previously charged with--and to which he pled
guilty, albeit with the ability to dispute most of the particulars--
because it is strikingly like his new crimes, and involves some of
the same participants, including Walter Kim and Steven Czik.  In both
the old and the new offenses, YOHAI usually obtains someone else's
money for a purportedly legitimate purpose, such as an investment,
but uses the money for personal expenses, or to pay pre-existing
debts, and then lulls the victim into believing that the money has
been properly used.  If the victim demands repayment, YOHAI often
sends checks written on accounts that contain insufficient funds to
buy time.  When YOHAI can no longer sustain the ruse with bouncing
checks, he typically asserts he has wired the money back to the
victim, and sends the victim fake documentation of a wire transfer,
insisting that there must be some banking mistake to explain why the
funds never arrive.

**YOHAI's Prior Loan Fraud**

From 2016 until early 2018, I conducted an investigation into
YOHAI for Title 18 United States Code 1349, Conspiracy to Commit Bank
Fraud and 1028A, Aggravated Identity Theft.

In summary, that investigation revealed YOHAI obtained more than
$15 million in real estate loans from Genesis Capital, a hard money
lender located in Los Angeles.  The stated purpose of the loans was
to purchase and rehabilitate properties at 2521 Nottingham Ave., Los

1  Angeles ("Nottingham"), 2401 Nottingham Ave., Los Angeles
2  ("Nottingham II"), 1550 Blue Jay Way, Los Angeles ("Blue Jay") and
3  779 Stradella Rd., Los Angeles ("Stradella"). YOHAI defaulted on each
4  of these loans resulting in foreclosure procedures being initiated.
5  During the default period, several of the checks sent by YOHAI to
6  Genesis Capital's loan servicing company for monthly loan payments
7  were returned due to non-sufficient funds ("NSF").  When the loan
8  servicer refused to accept any more checks, YOHAI sent a number of
9  wire transfer confirmation emails to Genesis Capital as proof that
10 the monthly payments had been made.  On at least one occasion, YOHAI
11 forwarded an email from Steven Czik to Genesis Capital which
12 purported to confirm a wire had been sent to the loan servicing
13 company to cover YOHAI's default payments.  Despite these
14 "confirmations" from YOHAI and Czik, no payments were received.
15       From late 2016 through late 2017, YOHAI attempted to refinance
16 the loans against the above listed properties from hard money lenders
17 under false pretenses.  For example, my review of records submitted
18 by YOHAI to Bridge Loan Financial revealed YOHAI submitted falsified
19 bank statements in an effort to induce Bridge Loan Financial to make
20 the loan.  These false bank statements showed account balances
21 between $2.2 million and $6 million for June through August 2016.  In
22 actuality the balances for that account for that period were between
23 -$13,908 and $0 due to the account being closed.
24       In December 2017, prior to the completion of foreclosure
25 proceedings, bankruptcies were filed to stall the foreclosures.
26
27
28

**YOHAI's Prior Fraud Against Investors**

My prior investigation also revealed that YOHAI obtained approximately $6 million from individual investors by making materially false statements to the investors about his bona fides and how the money would be used.  Once YOHAI obtained the funds, he did not use them for the stated purposes, but rather used them for personal expenses.  Despite having spent their funds on personal expenses, YOHAI continued to make false statements to investors about the security of their investments.  When the investors requested their funds returned, YOHAI lulled investors by sending text messages and emails which included photographs of falsified bank statements, deposit slips, cashier's checks, and wire transfer confirmations as proof of repayment.  Despite this "proof", investors never received the return of their funds.

**YOHAI's Prior Check Kiting**

Another facet of the prior investigation related to a check kiting scheme perpetrated by YOHAI on JP Morgan Chase Bank ("JPM") in which YOHAI deposited more than $500,000 checks written from his account at Banc of California into his JPM account.  YOHAI then wired out the funds to pay for a variety of personal expenses to include rent for a house in Malibu, down payment on a Porsche and to pay off his American Express bill.  The day after the wires were sent, the checks returned NSF.  YOHAI subsequently deposited two additional checks to his JPM account to cover the overdraft.  Both of these checks also returned NSF.

1  YOHAI Is on Bond After Entering a Guilty Plea

2     On February 26, 2018, YOHAI pleaded guilty to Title 18 United

3  States Code Section 1349, Conspiracy to Commit Bank Wire Fraud before

4  the Honorable Judge Andre Birotte.   AUSA Andrew Brown told me that at

5  defendant's request, sentencing was continued to January 18, 2019 and

6  that YOHAI remains free on bond pending sentencing.

7  YOHAI's Previous Admissions of Fraudulent Conduct

8  **February 24, 2017 Interview**

9     On February 24, 2017, I interviewed YOHAI at his residence.

10 This interview was recorded.

11    YOHAI made the following statements during that interview:

12    YOHAI admitted to check kiting.   Namely, in May 2017 he wrote

13 checks for more than $500,000 from a Banc of California account which

14 he knew did not have sufficient funds to cover the checks.   YOHAI

15 then deposited the checks at JPM and withdrew the funds before they

16 could return NSF.

17    YOHAI admitted to sending investors false and fraudulent

18 documents and information which purported to be proof of repayment in

19 an effort lull them and buy himself more time.   These false and

20 fraudulent documents and information included false cashier's checks,

21 false wire transfer forms, false deposit slips, and false bank

22 statements.

23    YOHAI also admitted to having false bank statements created for

24 Walter Kim.

25 Eddie Deleon Corroborates YOHAI's fraud

26    On October 3, 2018 and November 3, 2018, I interviewed Eddie

27 Deleon.   Deleon told me the following:

28

1     He was employed by YOHAI in 2015 and 2016.  One of Deleon's

2 duties was to create falsified financial documents for YOHAI.  Among

3 the falsified financial documents Deleon created were bank

4 statements, deposit slips, cashier's checks and wire transfer

5 confirmations.  YOHAI directed Deleon specifically as to what

6 information to include in the falsified documents.  YOHAI used the

7 falsified financial documents to apply for real estate loans and auto

8 loans, to increase his credit limit on credit cards, and to lull

9 investors and/or creditors into thinking the money had been wired

10 and/or deposited into their account.  For example, in one instance,

11 Deleon created falsified deposit slips purporting to show YOHAI had

12 repaid an investor $2 million, when in fact, YOHAI had not.

13     Also among the falsified bank statements YOHAI directed Deleon

14 to create were bank statements for Walter Kim.  Kim was one of

15 YOHAI's associates who was a bookie and loan shark from New York.

16     When YOHAI's properties went into default, YOHAI told Deleon he

17 was going to have Kim purchase the properties through a straw

18 company.  YOHAI said he was going to have Kim's straw company obtain

19 loan amounts which exceeded what YOHAI owed on the properties so

20 YOHAI could use the excess funds.

21           **II.   STATEMENT OF PROBABLE CAUSE**

22 YOHAI's Newly Attempted Fraud Against a Lender

23     In January 2018, I received information from a witness who

24 wishes to remain anonymous ("the Witness") indicating YOHAI had

25 contacted a hard money lender ("Lender A") in the Los Angeles area.

26 The Witness provided the following information:

27

28

1     YOHAI told Lender A that he represented a wealthy real estate

2  developer named Walter Kim who wanted to purchase Stradella and

3  Nottingham.   YOHAI submitted a loan request form on Kim's behalf

4  requesting an $8.5 million loan for Stradella's purchase and a $2.75

5  million loan for Nottingham's purchase.   YOHAI also sent appraisals

6  for Stradella and Nottingham which the Witness believed to be

7  excessively high compared to their real values.   Lender A ultimately

8  declined to pursue YOHAI and Kim's loans because the loan scenario

9  was suspicious and the appraisals appeared inflated.

10     In April 2018, I received documents from Lender A related to the

11  matter described above.   Among these documents was an appraisal for

12  Stradella dated August 18, 2017 which showed a value of $12.5

13  million.   This appraisal was emailed from YOHAI's assistant, Allison

14  Hathaway, to Lender A and YOHAI was copied on the email.   YOHAI

15  replied all to Hathaway's email, thanking her for sending the

16  appraisal.

17     Also among these documents were two Loan Submission Forms sent

18  by email from Jeff@fourthdimensionrecoveryla.com to Lender A: one for

19  Stradella and one for Nottingham.   I know from my investigation that

20  YOHAI operated an entity called Fourth Dimension Recovery LA out of

21  Stradella.

22     The Loan Submission Form for Stradella indicated the borrower

23  was Phoenix BA LLC. The contact information for Phoenix BA LLC was

24  listed as walter@phoenixinvestmentsla.com and (424)293-2644.   The

25  submission form requested a loan of $8.5 million to fund Phoenix BA

26  LLC's $12.5 million purchase of Stradella.

27

28

1     I searched the California Secretary of State for Phoenix BA LLC

2   and found an entity called Phoenix BA 1 LLC, for which YOHAI is the

3   registered agent and Kim is the manager.

4     The Loan Submission Form for Nottingham indicated the borrower

5   was Phoenix CF LLC, the contact information was also listed as

6   walter@phoenixinvestmentsla.com.  The submission form requested a

7   loan of $2.75 million to fund Phoenix CF LLC's $5.5 million purchase

8   of Nottingham.

9     I searched the California Secretary of State for Phoenix CF LLC

10  and did not find any responsive records.  However, I located records

11  for an entity called Phoenix Holdings RE LLC, for which YOHAI is the

12  registered agent.

13    Based upon my training and experience, I believe YOHAI was

14  attempting to defraud Lender A by making Kim appear to be a viable

15  borrower and by making Stradella and Nottingham appear to be worth

16  more than they actually were.

17    First, YOHAI previously had Deleon create falsified bank

18  statements for Kim.  YOHAI also previously told Deleon he was

19  planning to have Kim, through a straw company, purchase YOHAI's

20  distressed properties at inflated prices so YOHAI could use the

21  excess funds.

22    Second, although it does not appear that YOHAI sent Lender A

23  bank statements for Kim, YOHAI did tell Lender A that Walter Kim was

24  a wealthy real estate developer.  I know from my investigation into

25  YOHAI that Kim is not a real estate developer, but rather, Kim is a

26  bookie who also sub-leases properties on Airbnb.  I also know that

27  Kim is not wealthy.  I have reviewed several of Kim's bank accounts

28

for time periods spanning between 2016 and 2018. Review of these accounts revealed a series of bounced checks, account balances which were many times less than zero and rarely balances higher than $20,000.

Third, YOHAI provided inflated appraisal values to Lender A. The appraisal provided by YOHAI for Stradella indicated a value of $12.5 million. However, the Los Angeles County Assessor's Office assessed Stradella's value at $8,843,400 in 2018, which was up from $8,670,000 in 2017. YOHAI purchased Stradella in May 2016 for $8.5 million and no renovations have been done to the location since YOHAI's purchase.

YOHAI also indicated Nottingham's value was $5.5 million. However, the Los Angeles County Assessor's Office assessed Nottingham's value at $813,323 in 2018, which was up from $797,376 in 2017. YOHAI purchased Nottingham, which is a vacant lot with no structures, in July 2014 for $770,000. No development has been done to Nottingham since YOHAI's purchase.

<u>YOHAI Attempted Fraud Against Olive Mortgage</u>

In April 2018, I interviewed Chris Nicoletti at Olive Mortgage, a hard money lender in Los Angeles. Nicoletti told me YOHAI approached Olive Mortgage requesting to refinance a number of properties he owned, to include Stradella and Nottingham. YOHAI wanted to use the proceeds of the refinances to fund the purchase of yet another property. YOHAI was using an entity called Phoenix Holdings for these transactions.

1    Nicoletti told me YOHAI submitted appraisals for Stradella and
2    Nottingham which showed "excessively high" values which did not make
3    sense.

4    In April 2018, I interviewed Adi Harari, the owner of Olive
5    Mortgage.  Harari told me the paperwork submitted by YOHAI seemed
6    "made up" and the appraisals YOHAI submitted "did not make sense".

7    In April 2018, I received records from Olive Mortgage.  Among
8    these documents was an appraisal for Stradella dated January 29, 2018
9    which showed a value of $18 million and an appraisal for Nottingham
10   dated February 3, 2018 which showed a value of $7.5 million.

11   Also among Olive Mortgage's records was a Residential Purchase
12   Agreement (RPA) dated November 2017 which showed YOHAI offered to
13   purchase a property at 15433 & 15423 Brownwood Pl., Los Angeles
14   ("Brownwood") for $8,145,000.

15   Some of the documents sent to Olive Mortgage were emailed from
16   YOHAI's email accounts, jeff@marinw.com and yohai481@icloud.com.  For
17   example, on February 23, 2018, jeff@marinw.com, sent an appraisal for
18   Nottingham via email.  Also on February 23, 2018, yohai481@icloud.com
19   sent an email to Nicoletti regarding a schedule of real estate.  I
20   know from previous search warrants on YOHAI's email accounts and
21   digital devices that these email addresses are used by YOHAI.

22   Based upon the above and my previous investigation into YOHAI, I
23   believe YOHAI was attempting to commit loan fraud against Olive
24   Mortgage by obtaining refinance loans against Stradella and
25   Nottingham at amounts which well exceeded their actual values.

26   As with Lender A, the appraisals YOHAI submitted for Stradella
27   and Nottingham appear to be extremely inflated.  For example, in

28

1  January 2018, YOHAI submitted an appraisal for Stradella to Lender A

2  which showed a $12.5 million value, but then in April 2018, YOHAI

3  submitted an appraisal for the same property to Olive Mortgage which

4  showed an $18 million value.  As mentioned above, the Los Angeles

5  County Assessor's Office assessed the value of Stradella at

6  $8,843,400 in 2018 and $8,670,000 in 2017.  Furthermore, per open

7  source records, the estimated home values for the houses on both

8  sides and in front of Stradella with similar room count and square

9  footage, are between $4.4 million and $7.5 million.

10      As for Nottingham, in January 2018, YOHAI told Lender A that

11 Nottingham's value was $5.5 million, but then in April 2018, YOHAI

12 submitted an appraisal to Olive Mortgage indicating Nottingham's

13 value was $7.5 million.  As stated above, Nottingham is a vacant lot

14 with no structures on it and the Los Angeles County Assessor's Office

15 assessed Nottingham's value at $813,323 in 2018 and $797,376 in 2017.

16 <u>YOHAI Attempted Fraud Against PCG Financial</u>

17      In May 2018, I interviewed Chris Wallace, General Counsel for

18 PCG Financial, a hard money lender in Utah.  Wallace told me that in

19 early 2018, YOHAI contacted PCG Financial to obtain loans against

20 three properties he owned.  Initially, PCG Financial was interested

21 in the deals, but then Wallace heard about a federal investigation

22 related to YOHAI.  In or around February 2018, Wallace asked YOHAI

23 about the investigation and YOHAI denied having any involvement in a

24 federal investigation.  Wallace later learned that YOHAI had pleaded

25 guilty to federal crimes.  PCG Financial ultimately denied YOHAI's

26 loans.

27

28

In May 2018, I received documents from PCG Financial. Among those documents was an appraisal for Stradella dated January 29, 2018 which showed a value of $18 million, an appraisal for Nottingham dated February 3, 2018 which showed a value of $7.5 million, and an appraisal for Blue Jay dated January 10, 2018 which showed a value of $13.7 million. The documents also showed that in February 2018, YOHAI requested more than $20 million in refinance loans against these three properties from PCG Financial.

Based upon the above and my previous investigation into YOHAI, I believe YOHAI was attempting to commit loan fraud against PCG Financial by obtaining refinance loans against Stradella, Nottingham and Blue Jay at amounts which well exceeded their actual values.

As described in the previous sections, the appraisals for Stradella and Nottingham appeared to be extremely inflated. To reiterate, in January 2018, YOHAI submitted an appraisal for Stradella to Lender A which showed a $12.5 million value, but then in February 2018, YOHAI submitted an appraisal for the same property to PCG Financial which showed an $18 million value. However, YOHAI purchased Stradella for $8.5 million in May 2016 and no development has occurred on the property since that time and the Los Angeles County Assessor's Office assessed the value of Stradella at $8,843,400 in 2018 and $8,670,000 in 2017. Furthermore, open source records list the estimated values for the houses on both sides and in front of Stradella with similar room count and square footage, are between $4.4 million and $7.5 million. As such, the values listed in YOHAI's appraisals of $12.5 million and $18 million appear excessively inflated.

1    As for Nottingham, in January 2018, YOHAI told Lender A that
2  Nottingham's value was $5.5 million, but then in February 2018, YOHAI
3  submitted an appraisal to PCG Financial indicating Nottingham's value
4  was $7.5 million.  YOHAI purchased Nottingham, which is a vacant lot
5  with no structures, in July 2014 for $770,000 and no development has
6  been done to Nottingham since YOHAI's purchase and the Los Angeles
7  County Assessor's Office assessed Nottingham's value at $813,323 in
8  2018 and $797,376 in 2017.  As such, the value listed in YOHAI's
9  appraisal of $7.5 million appears excessively inflated.

10    Furthermore, the appraisal for Blue Jay also appeared to be
11  extremely inflated.  YOHAI submitted an appraisal for Blue Jay
12  showing a value of $13.7 million.  However, in June 2018, I
13  interviewed Karen Naylor, Bankruptcy Trustee handling the 1550 Blue
14  Jay Way LLC bankruptcy and she told me she had Blue Jay appraised and
15  the value was assessed at approximately $6 million.

16    In addition, public records show that in November 2017, Genesis
17  Capital, the hard money lender who had initiated foreclosure
18  proceedings on Blue Jay, finalized their foreclosure.  In July 2018,
19  Genesis sold Blue Jay to a third party for $5.2 million.  As such,
20  YOHAI's appraisal of $13.7 million appears excessively inflated.

21  YOHAI Defrauds Aaron Coppelson of Luxury Home Rental Fees
22  **Aaron Coppelson Interview**

23    In September 2018, I interviewed Aaron Coppelson, owner of a
24  property at 1814 Marcheeta Place, Los Angeles, California
25  ("Marcheeta").  Coppelson told me the following:

26    In August 2018, Coppelson had Marcheeta listed for sale at $20
27  million.  Coppelson's real estate agent, Sam Real handled the open

28

1    houses for this property.  YOHAI attended one of the open houses and

2    made an offer of $15.5 million to purchase Marcheeta.

3         Coppelson agreed to meet YOHAI for lunch to discuss the offer.

4    During this lunch, YOHAI told Coppelson he owned a property on

5    Stradella in Bel Air which was worth $20 million.  YOHAI said he only

6    owed $7 million on Stradella and he could take $13 million of equity

7    out of Stradella to help fund the purchase of Marcheeta.  As

8    indicated above, the value of Stradella is not $20 million, but

9    closer to $8.8 million per the Los Angeles County Assessor's Office

10   2018 assessment.  Furthermore, per United States Bankruptcy records,

11   the secured and unsecured claims against Stradella exceed $9.5

12   million.  Given these facts, YOHAI had no equity in the property.

13        Ultimately, Coppelson and YOHAI were unable to come to an agreed

14   purchase price.  YOHAI told Coppelson he had a number of high net

15   worth clients for whom he finds properties to lease.  YOHAI offered

16   to refer some of these clients to Coppelson to lease Marcheeta while

17   it was listed for sale.  Coppelson agreed.

18        Shortly after this, YOHAI said he had a client who wanted to

19   rent Marcheeta for a weekend to hold a seminar.  The client was

20   willing to pay $20,000 for the weekend.  Coppelson agreed.

21        The renter stayed at Marcheeta for the weekend.  When Real,

22   Coppelson's real estate agent, tried to pick up the $20,000 from the

23   renter, he was told payment had already been made to YOHAI directly.

24   Coppelson contacted YOHAI and asked for the $20,000.  YOHAI wrote

25   Coppelson a check for $20,000 and Coppelson deposited it into his

26   account at First Republic Bank ("FRB").

27

28

1   Shortly thereafter, YOHAI said he had another client who wanted
2   to rent Marcheeta for one night for $10,000.  Coppelson agreed.
3   Again, when Real went to pick up the rental fee, the renter said he
4   had already paid Yohai.

5   Around this same time, Coppelson was notified by FRB that
6   YOHAI's initial $20,000 check had returned for NSF.  Coppelson told
7   YOHAI and YOHAI wrote him another check, which Coppelson deposited
8   into FRB.

9   Within a short period of time, YOHAI said he had another client,
10  an NBA basketball player, who wanted to rent Marcheeta for two months
11  for $160,000.

12  Similar to the other two renters, when Real went to pick up the
13  rent from the NBA basketball player, Real was told the funds had
14  already been paid to YOHAI.  Coppelson asked YOHAI for the funds and
15  YOHAI agreed to send a wire transfer.

16  On more than on occasion, YOHAI told Coppelson he had wired the
17  funds.  YOHAI even provided Coppelson with a wire reference number
18  and yet, no funds ever arrived.  On two separate occasions, YOHAI
19  told Coppelson that YOHAI's attorney, Steve Czik had wired the funds.
20  Still no funds arrived.  On at least one occasion, Coppelson spoke
21  with Czik on the phone and Czik said the issue with the wire was his
22  fault and a new wire was on its way, yet no funds arrived.

23  Coppelson provided me with an email from Czik, using
24  steven@cziklaw.com, to yohai481@gmail.com which was further forwarded
25  to Real and Coppelson dated August 31, 2018.  I know from previous
26  search warrants that yohai481@gmail.com is an email used by YOHAI and
27  steven@cziklaw.com is an email used by Czik.  The email from Czik

28

1  contained the subject line, "Your Same Day wire transfer was

2  successfully sent".  The body of the email contained a wire transfer

3  confirmation from Bank of America for $180,000.  When YOHAI forwarded

4  the email, he wrote, "See below Full payment sent".

5      On October 2, 2018, I received records from Bank of America for

6  Czik Law PLLC's account.  The sole signatory on the account is Czik.

7  Review of this account revealed that on August 31, 2018, the balance

8  was $106.14.  On no day during the entire month of August 2018 was

9  the balance higher than $505.43.  Furthermore, the only outgoing wire

10  from the account was on August 10, 2018 for $400.00.  Based upon my

11  review of this account, not only was there no wire transfer to

12  Coppelson for $180,000, there were not sufficient funds in the

13  account to cover such a wire transfer.

14      In addition to sending a falsified wire transfer confirmation,

15  YOHAI also wrote Coppelson a series of checks to cover the amounts

16  owed.  At least five checks returned NSF and Coppelson's bank refused

17  to accept any more checks from YOHAI.

18      In an apparent attempt to lull Coppelson and Real, YOHAI sent

19  photographs of deposit slips and cashier's checks as proof he had

20  deposited the money into Coppelson's account.  Despite these

21  photographs, no money was ever deposited into Coppelson's account.

22      Coppelson provided me with screenshots of text messages YOHAI

23  sent to Real which were further forwarded to Coppelson.  The text

24  messages from YOHAI came from (323)422-5631.  I know from my own

25  telephonic communication with YOHAI that he utilizes this number.

26  The text messages from YOHAI contained the following:

27

28

1    - On August 6, 2018, YOHAI sent a photograph of a deposit slip
2      purportedly showing $60,000 deposited into Coppelson's account.
3    - On August 6, 2018, YOHAI sent a photograph of a wire
4      confirmation purportedly showing $60,000 had been wired to
5      Coppelson's account.
6    - On August 17, 2018, YOHAI sent a photograph of a deposit slip
7      purportedly showing $55,000 was deposited into Coppelson's
8      account.
9    - On August 22, 2018, YOHAI sent a photograph of a deposit slip
10     purportedly showing $55,000 was deposited into Coppelson's
11     account.

12     Despite all of these supposed "confirmations", the funds were
13 never received into Coppelson's account.

14     Coppelson told me that at one point, YOHAI offered to leave his
15 Rolls Royce Phantom as collateral for the money owed.  The Rolls
16 Royce stayed with Real for a couple of days until an unknown male
17 arrived and said the vehicle actually belonged to him and not YOHAI.
18 The unknown male showed the pink slip for the car and took it.

19     At another time, YOHAI said he was coming to Coppelson's house
20 to pay him the money he owed.  YOHAI said he was getting Coppelson's
21 money from a prominent marijuana grower who owed YOHAI $300,000.
22 When YOHAI arrived at Coppelson's house, he was driving a Porsche
23 Panamera.  YOHAI said he did not have Coppelson's money, but he
24 pulled out a large bag of marijuana from the trunk of the vehicle and
25 offered it to Coppelson as collateral for the money owed.  Coppelson
26 refused.

27

28
                                    17

1    At Coppelson's request, the NBA basketball player who had rented

2 Marcheeta left the property in mid-September 2018.  On September 22,

3 2018, Coppelson and Real went to Marcheeta to make sure it was in

4 good condition so they could continue to show it to potential buyers.

5 When they arrived, they encountered two unknown males, an unknown

6 female, a number of children and dogs.  Neither Coppelson nor Real

7 were aware of, or authorized anyone to stay in the residence.

8    One of the unknown males told Coppelson he paid YOHAI $7,000 to

9 rent Marcheeta for a birthday party.  The unknown male showed

10 Coppelson a contract with YOHAI and said $1,000 of the funds was to

11 use a Rolls Royce Phantom which was parked in the driveway.

12    In total, Coppelson estimated his loss to be approximately

13 $200,000.

14 **Sam Real Interview**

15    On October 10, 2018, I interviewed Sam Real and he told me the

16 following:

17    Real represented Coppelson to sell a property at 1814 Marcheeta

18 Pl.  In July 2018, during one of the open house showings for

19 Marcheeta, YOHAI arrived and said he wanted to make an offer.  YOHAI

20 claimed to own a property located on Blue Jay Way, which is down the

21 street from Marcheeta.  I know this to be a lie because Blue Jay Way

22 was foreclosed upon by Genesis Capital in November 2017 and sold to a

23 third party in July 2018.

24    YOHAI, Coppelson and Real met for lunch to discuss YOHAI's

25 potential purchase.  During lunch, YOHAI told Coppelson and Real that

26 he "turned state's evidence" on his father-in-law, Paul Manafort.

27 YOHAI made several statements to Real that he had to go to "D.C." to

28

1    meet with the Special Counsel's Office or "downtown" to meet with
2    "the feds".   I know these statements to be false as I was the case
3    agent for the Special Counsel's case against Manafort.   The last time
4    YOHAI met with me was in April 2018 and the topic of conversation was
5    YOHAI, not Manafort.

6         YOHAI told Coppelson he purchased high end properties, leased
7    them and then sold them when they appreciated.   YOHAI offered to
8    bring his clients to Marcheeta as well.   Coppelson agreed to let
9    YOHAI refer potential renters for Marcheeta.

10        The first clients YOHAI brought were a group of people who
11   wanted to hold a seminar at Marcheeta and agreed to pay $20,000 rent
12   for the weekend.   YOHAI was paid by the renters and subsequently
13   wrote Coppelson a check for $20,000.

14        The next renter was a professional soccer player who wanted to
15   rent Marcheeta for two weeks and agreed to pay $60,000.   As before,
16   the renter paid YOHAI and YOHAI wrote Coppelson a check.

17        The next renter was a NBA basketball player who wanted to rent
18   Marcheeta for two months and agreed to pay around $50,000 per month.
19   Again, the renter paid YOHAI.

20        All of the checks YOHAI wrote to Coppelson bounced.   When
21   Coppelson's bank would no longer accepted checks from YOHAI, YOHAI
22   sent fake wire transfer confirmation emails from his New York lawyer,
23   Steve Czik.   Despite these confirmation, no funds were ever received.

24        Real provided two emails from Czik which included confirmation
25   of wire transfers from Czik's BOFA account.   One dated August 21,
26   2018 for $78,000 and another dated August 31, 2018 for $180,000.
27   Both emails originated from Steven@cziklaw.com and were forwarded to
28

19

1  Real from YOHAI's jeff@marinw.com email address.  As stated above, I
2  reviewed Czik's BOFA account and found that on August 31, 2018, the
3  balance was $106.14.  On no day during the entire month of August
4  2018 was the balance higher than $505.43.  Furthermore, the only
5  outgoing wire from the account was on August 10, 2018 for $400.00.
6  Based upon my review of this account, not only were there no wire
7  transfers to Coppelson for $78,000 or $180,000, there were not
8  sufficient funds in the account to cover these wire transfers.

9      Real told me he spoke with Czik on the phone at least twice to
10 inquire about the funds which had been wired but never arrived.  Czik
11 told Real he had wired the funds, but due to a client bouncing a
12 check to Czik, the wire never went through.

13     On one occasion, YOHAI offered to give his Rolls Royce Phantom
14 as collateral for the money owed to Coppelson.  Real kept the Phantom
15 at his office for three days until an unknown male arrived, said he
16 owned the car and showed Real the pink slip.  The unknown male left
17 with the vehicle.

18     After the NBA basketball player left Marcheeta, Real met
19 Coppelson at the property.  Upon arrival, Real and Coppelson saw an
20 unknown male walking inside the property with two dogs.  Coppelson
21 notified the police.  The unknown male told the police, Coppelson and
22 Real that he had leased Marcheeta from YOHAI.

23     Real said YOHAI carries an iPhone and has two phone numbers,
24 (310)351-1340 and (323)422-5631.

25

26

27

28

**YOHAI Uses Walter Kim's and Jessica Manafort's Identities to Lull Coppelson**

Among the text messages YOHAI sent Real, which were forwarded to Coppelson, YOHAI included a photograph of check dated August 21, 2018 which was drawn from Bay-Sam REI LLC's account at Bank of America ("BOFA") and made payable to Czik Law PLLC for $47,000. On the memo line of the check was written, "42 Marcheeta Rent" and in the body of the text, YOHAI indicated [Czik] would wire $42,000 to Coppelson once this check was deposited.

On October 2, 2018, I received records from BOFA for Bay-Sam REI LLC's account. The sole signatory on the account is Walter Kim. Per these records, the account balance on August 21, 2018 was $589.86. The balance in the account on August 20, 2018 was -$59,305.15 and the balance on August 22, 2018 was -$59,517.70. In fact, at no time in August 2018 was the balance in Bay-Sam REI LLC's account higher than $15,364.54. Based upon this review, there were not sufficient funds to cover the check for $47,000 described above.

During my review of the Bay-Sam REI LLC account at BOFA, I also noted significant differences between Kim's signature, as signed on the signature card and on other checks written from the account, and the signature written on the $47,000 check in YOHAI's text message. For example, Kim's signature contains large swooping letters; its length takes up the better part of the signature line; and generally the "W" and "K" are readable. However, the signature on the $47,000 check YOHAI presented to Real contains only one letter which is not readable and is written in the center of the signature line. Given the fact that the check was not actually written from the account and the fact that the signatures are significantly different, I believe

YOHAI sent a fraudulent check containing a forgery of Kim's signature.

My review of the Czik Law PLLC account at BOFA for August and September 2018 showed no indication that this check was ever presented or deposited.  In fact the total of all deposits for that two month period only equaled $3,500.

Also among the text messages YOHAI sent Real, and which were forwarded to Coppelson, YOHAI included a photograph of a cashier's check dated August 22, 2018 which was remitted from Jessica Manafort's account at East West Bank and made payable to Coppelson's business for $60,000.

On October 9, 2018, I received records from East West Bank for Jessica Manafort.  Jessica Manafort maintains two accounts at East West Bank ending in X8343 and X3516.  Review of records for those accounts revealed that Jessica Manafort is the sole signatory on both accounts.  Further review showed that no cashier's check was obtained from either account payable to Coppelson's business.  In fact the only withdrawals from either account during the entirety of August and September 2018 were for $14,266 and $1,900 on August 13, 2018. Given these facts, I believe YOHAI sent a fraudulent cashier's check containing Jessica Manafort's name.

YOHAI Defrauds La Cienaga Check Cashing and Citibank

The following information was relayed to me by LAPD Detective Albert Shinfeld.  In addition to information relayed by Detective Shinfeld, I reviewed the below referenced documents provided by La Cienaga Check Cashing, text messages between Chris Dunbar and YOHAI, and bank records provided by Citibank and Bank of the West.

1    On January 22, 2018, YOHAI cashed a check at La Cienaga Check

2  Cashing for $5,000.  The check was dated January 19, 2018 and was

3  drawn from Fourth Dimension Recovery LLC's Citibank account ending in

4  8491.  At the time he cashed the check, YOHAI presented his New York

5  driver's license and phone number (323)422-5631.  In addition, YOHAI

6  was captured on La Cienaga Check Cashing's surveillance camera.  I

7  reviewed the surveillance footage and am confident the person cashing

8  the check was YOHAI.

9    On January 25, 2018, YOHAI cashed two additional checks at La

10  Cienaga Check Cashing for $7,500 and $2,250.  The $7,500 check was

11  dated January 19, 2018 and the $2,250 check was dated January 21,

12  2018.  Both checks were drawn from the same Fourth Dimension Recovery

13  LLC account at Citibank as the first check.

14    Later on January 25, 2018, Chris Dunbar, owner of La Cienaga

15  Check Cashing learned the first check for $5,000 had returned due to

16  NSF.  Dunbar reached out to YOHAI via text message and told him the

17  check had been returned.  YOHAI responded, "How the hell did this

18  bounce?" and then said he would bring cash to Dunbar by noon.  YOHAI

19  did not bring cash by noon that day.

20    Subsequently, on January 31, 2018, Dunbar learned the two

21  additional checks for $7,500 and $2,250 were also returned due to the

22  account being frozen.  Dunbar reached out to YOHAI again via text

23  message and told him the other two checks had been returned.  YOHAI

24  responded, "Wtf? This is bizarre" and said he would handle it that

25  day.  YOHAI further responded that the bounced check was due to a

26  check from one of his clients which bounced, thereby causing his

27  checks to bounce.  YOHAI promised to bring a certified cashier's

28

check that day to cover the amount due of $17,750.  YOHAI did not
bring a cashier's check.

On February 1, 2018, YOHAI promised Dunbar he would bring a
cashier's check the following day and would leave his Range Rover as
collateral.  On February 2, 2018, YOHAI provided Dunbar with a check
for $14,850 to partially cover the funds owed.  The check was dated
February 2, 2018 and was drawn from an account ending in 1486 at Bank
of the West in YOHAI's name.  Dunbar later learned that this check
was also returned due to NSF.

YOHAI repaid La Cienaga Check Cashing a total of $4,370 in cash
leaving the total amount of loss at $13,380.

Review of the Fourth Dimension Recovery, LLC account ending in
8491 ("account 8491") at Citibank revealed the balance in the account
on January 19, 2018 (the day the $5,000 and $7,500 checks were dated)
was -$4,525.94.  The balance on January 22, 2018 (the date YOHAI
presented the $5,000 check to La Cienaga Check Cashing) was
-$1,716.64.

Furthermore, between January 16, 2018 and January 31, 2018 there
were more than $100,000 in check reversals/credit adjustments due to
NSF activity.  Many of the deposits which were ultimately returned
were from accounts owned and/or controlled by YOHAI such as: $53,500
in returned deposits from YOHAI's account at First Entertainment
Credit Union and $7,000 in returned deposits from Kim's Yo-Ki Group,
LLC account at Wells Fargo Bank.

One example of YOHAI's kiting was on January 23, 2018 when YOHAI
deposited a $39,500 into account 8491.  This check was drawn from
another of YOHAI's accounts at First Entertainment Credit Union.

1  Prior to this deposit, the balance in account 8491 was $283.68.

2  Before the $39,500 check returned due to NSF, YOHAI made a series of

3  ACH payments out of account 8491 Account primarily to PayPal and

4  American Express.

5      Citibank froze account 8491 on January 31, 2018 due to a balance

6  of -$26,216.48.  The account was ultimately closed on March 30, 2018

7  with a balance of -$25,412.95.

8      Review of the YOHAI account ending in 1486 at Bank of the West

9  ("account 1486") revealed the balance in the account on February 2,

10  2018 (the day the $14,850 check was written and presented to La

11  Cienaga Check Cashing) was $369.75.  In fact, at no time in the

12  entirety of February 2018 was the account balance more than

13  $1,489.96.

14      Based upon my training and experience, and previous

15  investigation into YOHAI, I believe YOHAI defrauded La Cienaga Check

16  Cashing and Citibank by check kiting.

17  YOHAI's Other Frauds

18      The following information in this section was relayed to me by

19  LAPD Detective Albert Shinfeld.  In addition to information relayed

20  by Detective Shinfeld, I was present for the interview with Cyril

21  Chance and reviewed the below referenced documents provided by

22  victims and witnesses.

23  **Coachella Fraud**

24      On October 10, 2018, LAPD Detective Shinfeld interviewed Chance

25  in my presence.  Chance told us the following:

26      On or around April 6, 2018, Cyril Chance entered into a contract

27  with Ashley Jones to purchase three "artist passes" to Coachella

28

1   Music Festival ("tickets") for which he paid Jones $6,300 in cash.

2       Between April 7 and April 12, 2018, Chance was supposed to

3   obtain the tickets from Jones, but Jones never supplied the tickets.

4   On April 12, 2018, Chance went to Coachella in preparation for the

5   festival.  On April 12, 2018 or April 13, 2018, Jones told Chance to

6   meet with YOHAI at the will call booth to retrieve his tickets.

7       Review of text messages between Chance and Jones showed on April

8   12, 2018, Chance sent Jones a text message which read, "How can I get

9   the tix please?" Jones replied, "You can pick them up from my friend

10   Jeff, his number (323)422-5631... he's at will call today…"; and on

11   April 13, 2018, Chance sent Jones a text message which read, "What's

12   going on??? Everyone around us got their artist pass and not us.  I

13   don't understand." Jones replied, "Meet us at Indian Wells Tennis

14   Club 30 mins".

15       Chance told us he met YOHAI and Jones at the will call booth to

16   pick up the tickets he had purchased.  Upon arrival, Chance learned

17   that YOHAI did not have any artist passes.  YOHAI promised to repay

18   Chance if Chance followed YOHAI and Jones to the house in which they

19   were staying.  Chance tried to follow YOHAI, but he ran red lights

20   and stop signs and drove too erratically for Chance to keep up.

21       On multiple occasions, both YOHAI and Jones promised to repay

22   Chance.  YOHAI even sent Chance a wire transfer confirmation and yet

23   no wire ever arrived.

24       Review of an email between YOHAI using yohai481@gmail.com and

25   Chance showed on April 14, 2018, YOHAI forwarded Chance an email from

26   Czik which purported to confirm a wire transfer in the amount of

27

28

1  $6,300 had been wired from Czik's account at BOFA to Chance's

2  account.

3      YOHAI also told Chance he sent the money through PayPal, but no

4  money was ever received by Chance.  Review of Chance's text messages

5  with YOHAI showed on April 21, 2018, YOHAI sent Chance a series of

6  text messages claiming he had sent the funds via PayPal.

7      YOHAI then agreed to meet Chance in person to return the money

8  owed, but YOHAI never followed through on this meeting.  A review of

9  Chance's text messages with YOHAI showed on April 22, 2018, YOHAI

10  wrote "let's meet tomorrow in LA and do this cash".

11      Finally, YOHAI directed Chance to his assistant named "Allie" to

12  obtain repayment.  Chance tried to meet with Allie, but she made a

13  series of excuses as to why she could not meet.  Chance never

14  received any of his money back.  A review of Chance's text messages

15  with "Allie" at (301)938-4500 showed on April 25, 2018, Allie wrote,

16  "My apologies Cyril, I am unable to meet today."

17      I know from my previous investigation into YOHAI and personal

18  communication with Allison Hathaway, that (301)938-4500 is a phone

19  number utilized by Hathaway.

20  **Residential Burglary and Grand Theft**

21      Brian Zeng was interviewed by LAPD Officer Blake on May 18, 2018

22  and by Detective Shinfeld on October 10, 2018.  Subsequent to those

23  interviews, Zeng provided documents related to his stolen musical

24  equipment and text messages and emails between himself and YOHAI.

25      Zeng told the LAPD the following:

26      On May 8, 2018 to May 9, 2018, he rented Stradella from YOHAI

27  for $2,500.  Zeng provided a copy of the lease agreement for this

28

1   rental which was signed by YOHAI as managing member of Phoenix BA,

2   LLC.

3       On May 8, 2018, Zeng moved his musical equipment into Stradella

4   so he could play music with some people who were at the house,

5   including Christopher Hernandez.  On May 9, 2018, prior to Zeng's

6   lease period ending, Zeng departed Stradella, but left his personal

7   belongings, including his musical equipment at the property.  When

8   Zeng returned, his musical equipment was missing.  YOHAI was at

9   Stradella and told Zeng that Christopher Hernandez had taken Zeng's

10  musical equipment.

11      Zeng called Chris Hernandez who told Zeng he had his musical

12  equipment and would return it for $1,000.

13      Among the missing musical equipment was a Fender amplifier, a

14  Magnatone amplifier, an Ernie Ball electric guitar, and a Gretsch

15  electric guitar with Steve Luca's signature on the back.  Zeng

16  estimated the total value of his stolen belongings to be $20,000.

17      LAPD Officer Blake discovered that on May 12, 2018, YOHAI

18  entered Santa Monica Jewelry and Loan and pawned a Fender amplifier,

19  a Magnatone amplifier, an Ernie Ball electric guitar, and a Gretsch

20  electric guitar with Steve Luca's signature on the back for $3,000.

21  YOHAI provided a copy of his New York driver's license and thumbprint

22  when he pawned the items.

23      Det. Shinfeld told me that state charges have been filed against

24  YOHAI for the fraud against La Cienaga Check Cashing and an arrest

25  warrant is pending.  Detective Shinfeld also told me that state

26  charges are in the process of being filed against YOHAI for the

27  frauds against Cyril Chance and Brian Zeng.

28

**YOHAI is Difficult to Locate**

The last known residence for YOHAI was Stradella.  Per witnesses such as Chance and Real, YOHAI claimed to still be residing at Stradella during their communications with him.  However, I have reviewed bankruptcy documents and public records information which show that the foreclosure on Stradella was completed and the property was sold back to Genesis Capital on or around July 18, 2018.  As such, YOHAI no longer maintains any ownership in the property.

Multiple witnesses, including Real and Coppelson, have told me that YOHAI frequently leases and sub-leases properties in the Los Angeles area.  It is possible that YOHAI stays in different places at different times and has no permanent residence.

YOHAI has a Toyota Tundra registered to him; however, Real told me that he was present when that vehicle was repossessed around September 2018.  Multiple witnesses have told me that YOHAI drives a different vehicle each time they see him.  For example, Real told me he saw YOHAI in two different Rolls Royces, Coppelson told me he saw YOHAI in a Rolls Royce and a Porsche Panamera, Chance told me he saw YOHAI in a Cadillac Escalade, Dunbar told the LAPD that he saw YOHAI in a Range Rover, and the last two times I saw YOHAI, he was driving a Bentley and a Range Rover.  Given that none of the vehicles are registered to him, it is likely that YOHAI is renting cars to avoid detection.

**The Emails and Texts Described Above Crossed States Lines**

In my training and experience, virtually every email and text crosses state lines, even when both the sender and the recipient are within the same state.  This is because most major businesses that

provide email and text services maintain data centers through which
those communications are routed so that an email going from and to
California computers were typically be routed through a data center
in another state, for example, Utah.  Further, these businesses
typically maintain back-up data centers in different locations so
that if power outage or calamity, such as a wildfire, shut down one
data center, the data would still be safely stored at another data
center in a different state.  Further, some of the emails referenced
above had to have crossed state lines because the senders and
recipients reside in different states.  For example emails sent from
Coppelson to YOHAI crossed state lines from New York to California.

**YOHAI Carries Smart Phones which He Uses in His Frauds**

In my training and experience, most fraudsters carry their
smartphones on their person so that they can have immediate access to
them.  Typically, they store the contact information of their co-
conspirators in their smartphones, and communicate with them by
smartphone, whether by text, email, telephone, or through other
applications.  I know from my meetings with YOHAI that he carries his
phone on his person.  I know from my review of emails between YOHAI
and various witnesses and victims which contain the disclaimer "Sent
from my iPhone", that YOHAI utilizes an iPhone to send emails in
furtherance of his frauds to witnesses and victims.  For example,
YOHAI forwarded false wire confirmation emails from Czik to Real and
Coppelson using his iPhone.  I know from my review of text messages
between YOHAI and various witnesses and victims, that YOHAI utilizes
a phone to send text messages in furtherance of his frauds to
witnesses and victims.  For example, YOHAI used his phone to send

1  text messages photographs of falsified deposit slips to Coppelson and

2  Real.

3                    **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

4       As used herein, the term "digital device" includes any

5  electronic system or device capable of storing or processing data in

6  digital form, including central processing units; desktop, laptop,

7  notebook, and tablet computers; personal digital assistants; wireless

8  communication devices, such as telephone paging devices, beepers,

9  mobile telephones, and smart phones; digital cameras; gaming consoles

10  (including Sony PlayStations and Microsoft Xboxes); peripheral

11  input/output devices, such as keyboards, printers, scanners,

12  plotters, monitors, and drives intended for removable media; related

13  communications devices, such as modems, routers, cables, and

14  connections; storage media, such as hard disk drives, floppy disks,

15  memory cards, optical disks, and magnetic tapes used to store digital

16  data (excluding analog tapes such as VHS); and security devices.

17  Based on my knowledge, training, and experience, as well as

18  information related to me by agents and others involved in the

19  forensic examination of digital devices, I know that data in digital

20  form can be stored on a variety of digital devices and that during

21  the search of a premises it is not always possible to search digital

22  devices for digital data for a number of reasons, including the

23  following:

24       a.    Searching digital devices can be a highly technical process

25  that requires specific expertise and specialized equipment.  There

26  are so many types of digital devices and software programs in use

27  today that it is impossible to bring to the search site all of the

28

                                      31

necessary technical manuals and specialized equipment necessary to
conduct a thorough search.  In addition, it may be necessary to
consult with specially trained personnel who have specific expertise
in the types of digital devices, operating systems, or software
applications that are being searched.

b.   Digital data is particularly vulnerable to inadvertent or
intentional modification or destruction.  Searching digital devices
can require the use of precise, scientific procedures that are
designed to maintain the integrity of digital data and to recover
"hidden," erased, compressed, encrypted, or password-protected data.
As a result, a controlled environment, such as a law enforcement
laboratory or similar facility, is essential to conducting a complete
and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will
typically be so large that it will be highly impractical to search
for data during the physical search of the premises.  A single
megabyte of storage space is the equivalent of 500 double-spaced
pages of text.  A single gigabyte of storage space, or 1,000
megabytes, is the equivalent of 500,000 double-spaced pages of text.
Storage devices capable of storing 500 or more gigabytes are now
commonplace.  Consequently, just one device might contain the
equivalent of 250 million pages of data, which, if printed out, would
completely fill three 35' x 35' x 10' rooms to the ceiling.  Further,
a 500 gigabyte drive could contain as many as approximately 450 full
run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered
months or even years after they have been downloaded onto a hard

1   drive, deleted, or viewed via the Internet.   Electronic files saved

2   to a hard drive can be stored for years with little or no cost.   Even

3   when such files have been deleted, they can be recovered months or

4   years later using readily-available forensics tools.   Normally, when

5   a person deletes a file on a computer, the data contained in the file

6   does not actually disappear; rather, that data remains on the hard

7   drive until it is overwritten by new data.   Therefore, deleted files,

8   or remnants of deleted files, may reside in free space or slack

9   space, i.e., space on a hard drive that is not allocated to an active

10  file or that is unused after a file has been allocated to a set block

11  of storage space, for long periods of time before they are

12  overwritten.   In addition, a computer's operating system may also

13  keep a record of deleted data in a swap or recovery file.   Similarly,

14  files that have been viewed on the Internet are often automatically

15  downloaded into a temporary directory or cache.   The browser

16  typically maintains a fixed amount of hard drive space devoted to

17  these files, and the files are only overwritten as they are replaced

18  with more recently downloaded or viewed content.   Thus, the ability

19  to retrieve residue of an electronic file from a hard drive depends

20  less on when the file was downloaded or viewed than on a particular

21  user's operating system, storage capacity, and computer habits.

22  Recovery of residue of electronic files from a hard drive requires

23  specialized tools and a controlled laboratory environment.   Recovery

24  also can require substantial time.

25          e.   Although some of the records called for by this warrant

26  might be found in the form of user-generated documents (such as word

27  processing, picture, and movie files), digital devices can contain

28

                                    33

other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregated from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of

1   particular data on a digital device.  For example, to rebut a claim

2   that the owner of a digital device was not responsible for a

3   particular use because the device was being controlled remotely by

4   malicious software, it may be necessary to show that malicious

5   software that allows someone else to control the digital device

6   remotely is not present on the digital device.  Evidence of the

7   absence of particular data on a digital device is not segregated from

8   the digital device.  Analysis of the digital device as a whole to

9   demonstrate the absence of particular data requires specialized tools

10  and a controlled laboratory environment, and can require substantial

11  time.

12       g.   Digital device users can attempt to conceal data within

13  digital devices through a number of methods, including the use of

14  innocuous or misleading filenames and extensions.  For example, files

15  with the extension ".jpg" often are image files; however, a user can

16  easily change the extension to ".txt" to conceal the image and make

17  it appear that the file contains text.  Digital device users can also

18  attempt to conceal data by using encryption, which means that a

19  password or device, such as a "dongle" or "keycard," is necessary to

20  decrypt the data into readable form.  In addition, digital device

21  users can conceal data within another seemingly unrelated and

22  innocuous file in a process called "steganography."  For example, by

23  using steganography a digital device user can conceal text in an

24  image file that cannot be viewed when the image file is opened.

25  Digital devices may also contain "booby traps" that destroy or alter

26  data if certain procedures are not scrupulously followed.  A

27  substantial amount of time is necessary to extract and sort through

28

data that is concealed, encrypted, or subject to booby traps, to
determine whether it is evidence, contraband or instrumentalities of
a crime.   In addition, decryption of devices and data stored thereon
is a constantly evolving field, and law enforcement agencies
continuously develop or acquire new methods of decryption, even for
devices or data that cannot currently be decrypted.

**Request to Use Biometric Features to Unlock Digital Devices**

Based on my training and experience, and knowledge of this
investigation as discussed previously, I believe that digital
devices, such as smartphones, will be found during the search.

a.   I know from my training and experience and my review of
publicly available materials that several hardware and software
manufacturers offer their users the ability to unlock their devices
through biometric features in lieu of a numeric or alphanumeric
passcode or password.   These biometric features include fingerprint-
recognition, face-recognition, iris-recognition, and retina-
recognition.   Some devices offer a combination of these biometric
features and enable the users of such devices to select which
features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user
may enable the ability to unlock the device through his or her
fingerprints.   For example, Apple Inc. ("Apple") offers a feature on
some of its phones and laptops called "Touch ID," which allows a user
to register up to five fingerprints that can unlock a device.   Once a
fingerprint is registered, a user can unlock the device by pressing
the relevant finger to the device's Touch ID sensor, which on a cell
phone is found in the round button (often referred to as the "home"

1   button) located at the bottom center of the front of the phone, and
2   on a laptop is located on the right side of the "Touch Bar" located
3   directly above the keyboard.  Fingerprint-recognition features are
4   increasingly common on modern digital devices.  For example, for
5   Apple products, all iPhone 5S to iPhone 8 models, as well as iPads
6   (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or
7   later, and MacBook Pro laptops with the Touch Bar are all equipped
8   with Touch ID.  Motorola, HTC, LG, and Samsung, among other
9   companies, also produce phones with fingerprint sensors to enable
10   biometric unlock by fingerprint.  The fingerprint sensors for these
11   companies have different names but operate similarly to Touch ID.
12        c.   If a device is equipped with a facial-recognition feature,
13   a user may enable the ability to unlock the device through his or her
14   face.  To activate the facial-recognition feature, a user must hold
15   the device in front of his or her face.  The device's camera analyzes
16   and records data based on the user's facial characteristics.  The
17   device is then automatically unlocked if the camera detects a face
18   with characteristics that match those of the registered face.  No
19   physical contact by the user with the digital device is necessary to
20   unlock, but eye contact with the camera is often essential to the
21   proper functioning of these facial-recognition features; thus, a user
22   must have his or her eyes open during the biometric scan (unless the
23   user previously disabled this requirement).  Several companies
24   produce digital devices equipped with a facial-recognition-unlock
25   feature, and all work in a similar manner with different degrees of
26   sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and
27   Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017).
28

1   Apple calls its facial-recognition unlock feature "Face ID."  The

2   scan and unlock process for Face ID is almost instantaneous,

3   occurring in approximately one second.

4       d.   While not as prolific on digital devices as fingerprint-

5   and facial-recognition features, both iris- and retina-scanning

6   features exist for securing devices/data.  The human iris, like a

7   fingerprint, contains complex patterns that are unique and stable.

8   Iris-recognition technology uses mathematical pattern-recognition

9   techniques to map the iris using infrared light.  Similarly, retina

10  scanning casts infrared light into a person's eye to map the unique

11  variations of a person's retinal blood vessels.  A user can register

12  one or both eyes to be used to unlock a device with these features.

13  To activate the feature, the user holds the device in front of his or

14  her face while the device directs an infrared light toward the user's

15  face and activates an infrared-sensitive camera to record data from

16  the person's eyes.  The device is then unlocked if the camera detects

17  the registered eye.  Both the Samsung Galaxy S8 and Note 8 (discussed

18  above) have iris-recognition features.  In addition, Microsoft has a

19  product called "Windows Hello" that provides users with a suite of

20  biometric features including fingerprint-, facial-, and iris-unlock

21  features.  Windows Hello has both a software and hardware component,

22  and multiple companies manufacture compatible hardware, e.g.,

23  attachable infrared cameras or fingerprint sensors, to enable the

24  Windows Hello features on older devices.

25      In my training and experience, users of electronic devices often

26  enable the aforementioned biometric features because they are

27  considered to be a more convenient way to unlock a device than

28

entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled.  This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time.  For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.  I do not know the passcodes of the devices likely to be found during the search.

In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my

training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require YOHAI to unlock the device using biometric features in the same manner as discussed in the following paragraph.

For these reasons, the warrant I am applying for would permit law enforcement personnel to compel the use of (1) YOHAI's thumb- and/or fingerprints on the device(s), and (2) hold the device(s) in front of the face of YOHAI with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.  With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## Conclusion

Based upon the above, I submit there is probable cause to believe YOHAI violated 18 U.S.C. §§ 1349, 1343, 1028A, and 3147, and that evidence of those violations, as described in attachment B, will be found on YOHAI's person, as described in attachment A, both of which are incorporated by reference.

Sherine D. Ebadi
Special Agent, FBI

Subscribed to and sworn before me
on October 17th, 2018.

UNITED STATES MAGISTRATE JUDGE

41